**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Norfolk Division**

PAMELA L. DEPAOLI,

      **Plaintiff,**

      **v.**                           **CIVIL ACTION NO. 2:04cv635**

VACATION SALES ASSOCIATES, L.L.C.,

      **Defendant.**

*MEMORANDUM OPINION & ORDER*

      This matter comes before the Court on Vacation Sales Associates, L.L.C.'s ("VSA") Motion for Judgment as a Matter of Law, or in the alternative, Motion for a New Trial. Having held a jury trial and carefully reviewed the parties' pleadings, the Court finds this matter ripe for judicial determination without an additional hearing. For the reasons below, the Court **DENIES** VSA's Motion for Judgment as a Matter of Law and **DENIES** VSA's Motion for a New Trial.

**I. FACTUAL AND PROCEDURAL HISTORY**

      Plaintiff is a forty-seven year old female who began working for VSA in or about April 1997. At all relevant times, Tim Faulkner ("Faulkner") was the President of VSA and George Georgitsis ("Georgitsis") was Vice President of Sales at VSA.

      In October 2001, VSA created a position entitled "Director of In House Sales," which was neither advertised nor offered to Plaintiff. When Plaintiff inquired about the position, she was told it was being eliminated. However in November 2001, David Hamlin ("Hamlin"), a male employee, was hired for the position. From that time, Plaintiff alleges that Hamlin began ongoing harassment

1

of Plaintiff because of her age and sex.  On or about February 27, 2002, Plaintiff reported to Faulkner that Hamlin was making disparaging sexual and age-related remarks about Plaintiff and her staff. Faulkner told Plaintiff that he would investigate her complaint.  Shortly thereafter, Faulkner told Plaintiff that she could leave the company if she did not like the existing state of affairs.  In or about March 1, 2002, Plaintiff contacted the Equal Employment Opportunity Commission ("EEOC"), but did not file a formal complaint.  After making contact, Plaintiff alleges that she told other employees at VSA that she had gone to the EEOC.

In or about May 2002, the position of Director of In House Sales was vacated.  Plaintiff again inquired about the position, and again was told the position was being eliminated.  In December 2002, the position was filled by a younger male employee.  In or about May 2003, VSA created a position entitled "Director of Sales Managers," which was neither advertised nor offered to any of the sales managers at that time, including Plaintiff.

In March of 2003, Plaintiff went to the EEOC to start an investigation. Upon returning to work, Plaintiff again informed Georgitsis and other employees that she had gone to the EEOC to begin an investigation.  In April 2003, Plaintiff began to suspect that her sales figures, otherwise known as the Average Per Guest ("APG"),[1] were being falsified and manipulated in retaliation for her going to the EEOC.  In May 2003, Plaintiff filed a formal complaint with the EEOC.  The complaint charged that VSA engaged in age and sex discrimination, and retaliation for opposing an unlawful employment practice.

---

[1]  The APG is a sales productivity measure used to evaluate how well employees are doing, and is calculated by dividing the total sales volume by the total number of tours conducted.

On July 17, 2003, VSA removed Plaintiff from her position as sales manager and offered a position as an in house salesperson.  Plaintiff did not find this to be an acceptable alternative.

On October 27, 2004, Plaintiff filed her original complaint with this Court.  The case proceeded to trial, and on January 24, 2006 the jury returned a verdict in favor of Plaintiff for $2.5 million in compensatory damages, $5 million in punitive damages, and $200,000 in back pay damages.  On January 27, 2006, the Court entered an order denying any award of front pay damages.  VSA filed the instant Motion for Judgment as a Matter of Law, or in the Alternative Motion for a New Trial on February 14, 2006.  Plaintiff filed a response on March 10, 2006.  VSA filed a reply to Plaintiff's response on March 16, 2006.  This matter is now ripe for adjudication by the Court.

## II. LEGAL STANDARD

### A.    Judgment Notwithstanding the Verdict

A district court may grant a motion for judgment notwithstanding the verdict if there is no legally sufficient evidentiary basis for a reasonable jury to find for the nonmovant.  *See* FED. R. CIV. P. 50.  In assessing legal sufficiency, a court may not retry factual findings or credibility determinations the jury has reached.  Instead, a court must ignore the substantive weight of any evidence supporting the moving party and assume that any testimony in favor of the nonmovant is credible, "unless totally incredible on its face."  *Daniel v. Jones*, 39 F. Supp. 2d 635, 643-44 (E.D.Va. 1999) (quoting *Cline v. Wal-Mart Stores, Inc.*, 144 F.3d 294, 301 (4th Cir. 1998)).

### B.    Motion for New Trial

Under Federal Rule of Civil Procedure 59(a), a federal district court will grant a motion for a new trial on all or part of the issues if "(1) the verdict is against the clear weight of the evidence, or (2) is based upon evidence which is false, or (3) will result in a miscarriage of justice, even though

3

there may be substantial evidence which would prevent the direction of a verdict." *Cline v. Wal-Mart Stores, Inc.*, 144 F.3d 294, 301 (4th Cir. 1998) (quoting *Atlas Food Sys. & Servs., Inc. v. Crane Nat'l Vendors, Inc.*, 99 F.3d 587, 594 (4th Cir. 1996)).  Further, a "motion for new trial may invoke the discretion of the court . . . on the claim . . . that the damages are excessive, . . . the trial was not fair to the party moving, and may raise questions of law arising out of alleged substantial errors in admission or rejection of evidence." *Montgomery Ward & Co. v. Duncan*, 311 U.S. 243, 251 (1940). In considering a motion for a new trial, the district court may weigh the evidence and consider the credibility of the witnesses.  *See Wyatt v. Interstate & Ocean Transport Co.*, 623 F.2d 888, 891 (4th Cir.1980).

### III. DISCUSSION

**A.      Motion for Judgment Notwithstanding the Verdict**

VSA seeks judgment notwithstanding the verdict, arguing that Plaintiff failed to produce sufficient evidence that its stated legitimate nondiscriminatory reason was pretext for discrimination. Specifically, VSA asserts that both parties stipulated that VSA removed Plaintiff from her position as sales manager because of her low performance, namely that her APG had become the lowest of all front line sales mangers.  VSA argues that Plaintiff failed to meet the burden of proving that its articulated reason was not the real reason for Plaintiff's termination.  In response, Plaintiff contends that the evidence placed before the jury was more than sufficient to support a finding that VSA's proffered reason for terminating Plaintiff was in fact a pretext, or a coverup, for the real reason behind Plaintiff's termination, that being retaliation for her filing a charge with the EEOC.

Once a defendant has presented a reason for an adverse employment action, a plaintiff must show that defendant's reason for the discharge "was mere pretext for retaliation by proving

both that the reason was false and that discrimination was the real reason for the challenged conduct." *Beall v. Abbott Laboratories*, 130 F.3d 614, 619 (4th Cir. 1997) (quoting *Hicks*, 509 U.S. at 515) (internal quotes omitted).  At trial, the court instructed the jury that, " the ultimate burden of persuading [you] . . . that defendant intentionally discriminated against [Plaintiff] . . . is at all times with [Plaintiff] . . . the Defendant is not required to prove that its decision was actually motivated by the stated legitimate nondiscriminatory reason." (Jury Inst. 13).  Further, in defining pretext, the Court instructed the jury that:

> if the Defendant produced evidence of a legitimate, non-discriminatory reason for the removal of the Plaintiff as sales manager, you . . . must find for the Defendant *unless* . . . the Plaintiff has proved that the reason given by the Defendant is not the true reason for the Plaintiff's removal as sales manager, or that it is more likely than not that, except for the Plaintiff having filed a charge with the EEOC, she would not have been removed from her position as sales manger."

(Jury Inst. 15) (emphasis added).  After deliberating, the jury found for Plaintiff, and thus determined that Plaintiff met its burden in establishing that VSA's legitimate nondiscriminatory reason was pretext.

Accordingly, the ultimate question before the Court is whether a jury, viewing the evidence in a light most favorable to Plaintiff, could have properly reached the conclusion reached by this jury, namely that VSA's reason for terminating Plaintiff was a coverup to hide that Plaintiff's termination was in retaliation for filing a claim with the EEOC.

In this case, Plaintiff attempted to show that VSA's proffered explanation was pretext by presenting evidence that VSA participated in tactics to purposefully lower her APG in comparison to other front line sales managers.  Such tactics included cherry picking, improperly crediting non-

5

producing tours to members of Plaintiff's sales team, and failing to provide Plaintiff or her sales team with referral business.  In reviewing the record, the Court finds that the evidence presented at trial was sufficient such that a reasonable jury could have ruled in favor of Plaintiff.  The Court will review the testimony of witnesses Plaintiff provided to prove pretext.

1.      *Witness Victoria Headden ("Headden")*

From September 2002 to May 2003, Headden was the receptionist at VSA responsible for checking in clients and assigning tours to sales representatives.  Through the testimony of Headden, Plaintiff proffered evidence that during a period shortly after Plaintiff went to the EEOC in March 2003, there was a practice of switching and reassigning tours to different sales people.  (Trial Tr. 110:14-19).  Specifically, Headden testified that Georgitsis specifically requested that she credit Plaintiff's sales teams with tours that did not result in a sale, even though the sales members had not conducted the tours. (Trial Tr. 110:20-111:24).  Additionally, Headden testified that the assigning of non-producing sales tours to Plaintiff and her team were disproportionate compared to other sales mangers.  (Trial Tr. 117:4-13).  As a result, Headden testified that such practices could "negatively impact" Plaintiff's sales team, and ultimately result in a lower APG.  (Trial Tr.111:1-10).  This testimony, taken in the light most favorable to Plaintiff, could without question leave a reasonable juror to believe that Plaintiff's numbers were being manipulated in retaliation for filing an EEOC charge.  Such conclusion is not unreasonable, in light of the fact that the actions occurred from March through May of 2003, the period immediately following Plaintiff going to the EEOC. Accordingly, Headden's testimony was sufficient evidence that a reasonable jury could use in finding that VSA's proffered reason for terminating Plaintiff was pretext.

2.      *Witnesses Cynthia McLachlin ("McLachlin") and Sandra K. Williams ("Williams")*

Plaintiff offered the testimony of McLachlin and Williams, both former VSA employees. McLachlin testified that she overheard a conversation between Georgitsis and Faulkner in which Faulkner stated, "I'm not going to have any lawsuits on my watch," and ordered Georgitsis to take care of the matter. (Trial Tr. 81:6-7). After the conversation, McLachlin testified that Georgitsis informed her that the call was about Plaintiff, and that VSA wanted her to quit. McLachlin quoted Georgitsis as saying, "[t]hat's what we are hoping that she does for going to the EEOC, [Faulkner] doesn't want her here any longer." (Trial Tr. 83:3-4). The Court acknowledges that this conversation occurred before March 2003 when Plaintiff officially began the process to file her EEOC complaint; however, the conversation occurred on or about March 4, 2002, a few days after Plaintiff first sought advice from the EEOC. The Court finds such evidence sufficient for a reasonable jury to infer that when VSA discovered that Plaintiff went to the EEOC again, in March 2003, it took actions consistent with Faulkner's intent expressed through his prior conversation with Georgitsis. *See Baynard v. Malone*, 268 F.3d 228, 234 (4th Cir. 2001) (the court must view the evidence in the light most favorable to the nonmovant, and draw all reasonable inferences in her favor without weighing the evidence or assessing the witnesses' credibility).

Additionally, Williams testified that she was told in a conversation with Georgitsis that if she went to the EEOC, she would end up like Plaintiff. This conversation occurred after Plaintiff was terminated. (Trial Tr. 408:1-5). The Court finds that the testimonies of both McLachlin and Williams strengthen Plaintiff's case such that a reasonable juror could find VSA's articulated reason pretext.

3.    *Plaintiff's Testimony*

Plaintiff's own testimony further substantiated the claims of Headden.  Plaintiff testified that in February 2003, she received an award for being salesperson of the month based on her APG in January 2003.  Additionally, Plaintiff testified that in March 2003 she had the highest APG of all sales managers.  However, Plaintiff testified that in April 2003 she began to suspect that her APG data was being manipulated because her sales team numbers began to decline.  This was the month immediately following her going to the EEOC, and the same time period that Headden testified she was asked to credit non-producing tours to Plaintiff and her sales team.  Plaintiff further testified that Georgitsis told her that if she "didn't start an investigation with the EEOC, [she] would have gotten [the] In-House Director position."  Plaintiff testified that this comment was made after she returned from leave in or around June 19, 2003.  (Trial Tr. 179:20-180:5).  The Court finds that based on the sequence of events and the time frame in which Plaintiff's numbers began to take a turn, it is not unreasonable that a juror could find that VSA's reason for terminating Plaintiff was a pretext for discrimination.

It is well established that the Court must grant judgement notwithstanding the verdict if a reasonable jury could only rule in favor of VSA; however, where reasonable minds could differ then the jury's verdict must stand.  *Wyatt v. Interstate & Ocean Transport Co*., 623 F.2d 888, 891 (4th Cir. 1980).  Based on the above referenced testimonial evidence presented in trial, the Court finds that the jury could have reasonably disbelieved VSA's articulated reason for terminating Plaintiff, and find that their actions were in fact pretext for retaliating against Plaintiff for filing an EEOC complaint.  Accordingly, VSA's Motion for Judgment Notwithstanding the Verdict is **DENIED**.

**B.      Motion for New Trial**

Under Federal Rule of Civil Procedure 59(a), a federal district court will grant a motion for a new trial on all or part of the issues if "(1) the verdict is against the clear weight of the evidence, or (2) is based upon evidence which is false, or (3) will result in a miscarriage of justice, even though there may be substantial evidence which would prevent the direction of a verdict." *Cline v. Wal-Mart Stores, Inc.*, 144 F.3d 294, 301 (4th Cir. 1998) (quoting *Atlas Food Sys. & Servs., Inc. v. Crane Nat'l Vendors, Inc.*, 99 F.3d 587, 594 (4th Cir. 1996)).  However, the decision to grant a new trial is a matter resting in the sound discretion of the trial judge and this action is not reviewable upon appeal save the most exceptional circumstances. *Bristol Steel & Iron Works, Inc. v. Bethlehem Steel corp.*, 41 F.3d 182, 186 (4th Cir. 1994).

VSA asserts that the Court should grant a new trial on several grounds, including: (1) the jury's compensatory damages award is excessive and demonstrates the jury's decision was based on passion and prejudice; (2) the jury's punitive damages award is against the greater weight of the evidence and is excessive; (3) the jury's back pay award is excessive; and (4) several evidentiary errors resulted in unfair prejudice.  The Court will address each ground separately.

*1.      Compensatory Damages*

"[C]ompensatory damages are awarded for future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses." 42 U.S.C. § 1981a(b)(3) (2006).  In reviewing awards for compensatory damages, the factual record is compared to the verdict "to determine compatibility." *Cline v. Walmart,* 144 F.3d 294, 305 (4th Cir. 1998).  If a court determines the jury's verdict is against the weight of the evidence or based on false evidence, the court should reduce the award or grant a new trial. *Id.*

9

In this case, the total compensatory and punitive award of $200,000 is not excessive.[2] However, VSA argues that Plaintiff's verdict for compensatory damages is not supported by the evidence.  Specifically, VSA assets that there was no evidence that Plaintiff sought medical treatment, took medication, had physical symptoms, or that the alleged emotional distress affected her daily life activities or personal relationships.  This argument fails.  The Fourth Circuit has held that "a plaintiff's testimony, standing alone can support an award of compensatory damages for emotional distress."  *Bryant v. Aiken Reg'l Med. Ctrs. Inc.,* 333 F.3d 536, 546 (4th Cir.2003) (citing *Price v. City of Charlotte,* 93 F.3d 1241, 1251 (4th Cir.1996)).  Furthermore, the Fourth Circuit has held that physical symptoms of emotional distress are not a prerequisite for an award of compensatory damages. *Cline*, 144 F.3d at 306.

In this case, Plaintiff testified she suffered physical symptoms and signs of stress related to VSA's treatment, including anxiety, lack of sleep, lack of appetite, and illness. (Trial Tr. 175:24-176:4).  Due to the stress, Plaintiff's doctor placed her on a leave of absence from work. (Trial Tr. 175: 10-14).  Further, Plaintiff testified that her personal relationships were affected. (Trial Tr. 176:3-4).  Additionally, as a result of the termination, Plaintiff testified that she struggles financially to pay bills and support her children, and feels "very depressed," and "worthless." (Trial Tr. 197:5-16).  Based on the totality of the evidence, it is reasonable that the jury could conclude that Plaintiff suffered emotional distress, suffering, and mental anguish that would warrant an award of

---

[2]  The Court granted VSA's Motion to Amend the Judgment to apply the Statutory Cap required by 42 U.S.C. § 1981a(b)(3).  As a result, the jury's award of $ 2.5 million compensatory damages and $5 million punitive damages has been reduced to a combined award of $200,000. The Court finds that an award within the statutory cap is not excessive.

compensatory damages.  Accordingly, the Court holds that the award is appropriate and supported by the evidence.

      *2.*     *Punitive Damages*

VSA asserts that a new trial is proper because Plaintiff's punitive damages award goes against the clear weight of evidence.  Specifically, VSA argues that in order to impute punitive damages liability on an employer there must be a showing that the employer failed to make a good faith effort to comply with the law.  VSA asserts that the evidence demonstrated that VSA, acting through Faulkner as president, made a good faith effort to comply with Title VII.  Although VSA is correct in its citation of the law on punitive damages, the Court disagrees with its conclusion.

The United States Supreme Court ("Supreme Court") has held that punitive damages are limited to cases in which "the employer has engaged in intentional discrimination and has done so with malice or with reckless indifference to the federally protected rights of an aggrieved individual." *Kolstad v. American Dental Association,* 527 U.S. 526, 529-30 (1999) (internal quotations omitted) (citing 42 U.S.C. § 1981a(b)(1)).  Thus, the standard is whether the employer retaliates "in the face of a perceived risk that its actions will violate federal law." *Id*. at 535-36.  However, "in the punitive damages context, an employer may not be vicariously liable for the discriminatory employment decisions of managerial agents where these decision are contrary to the employer's good-faith efforts to comply with Title VII." *Id*. at 545.

On review of the record, the Court finds that there was sufficient evidence for the jury to conclude that VSA did not make a good faith effort to comply with Title VII.  VSA asserts that it took a good faith effort to comply with the law through the actions of Faulkner, however, there is

conflicting evidence as to his actions. Faulkner testified that he first became aware of Plaintiff's EEOC complaint on or around May 14, 2003, and held a meeting with leadership in the organization that same day. (Trial Tr. 298:18-21, 299). However, Georgitsis testified that he first became aware of the EEOC charge in July 2003. Not only does this evidence conflict with Plaintiff's testimony that she told Georgitsis in March 2003 that she had gone to the EEOC, but more importantly it conflicts with Faulkner's testimony that he held a meeting to discuss the EEOC charge in mid May. Such conflicting evidence puts into question the good faith actions that VSA asserts Faulkner made. Moreover, the jury heard testimony that Faulkner had a hostile attitude toward EEOC complaints, as evidenced by him telling Georgistis in March 2002 that he was not going to have any lawsuits on his watch. (Trial Tr. 81:2-9). Further, testimony was presented that Georgistis told Williams, after Plaintiff's removal, that she could end up like Plaintiff if she filed an EEOC complaint. (Trial Tr. 408:1-5). Such acts, under the leadership of Faulkner are in disaccord with any efforts of good faith.

Additionally, fully aware that Plaintiff had filed an EEOC complaint, Faulkner failed to take any steps to investigate the reasons behind her low APG when Georgitsis came to him about the decision to remove Plaintiff from the position of sales manager. Faulkner testified that he "concurred" with Georgitsis' decision based on the numbers presented to him, however, the Court finds this argument suspect and lacking in good faith. (Trial Tr. 313-314). It would only seem prudent that after finding that Plaintiff had filed an EEOC complaint, Faulkner, before concurring with a decision to remove Plaintiff for her low APG, should have made an effort to investigate the circumstances surrounding Plaintiff's low APG. This is especially the case given that, in Faulkner's own words, Plaintiff "had a good sales history, and a good closing history with the company." (Trial Tr. 303:8-12). The Court finds that the action to remove Plaintiff from sales manager within months

of discovering that she filed an EEOC complaint is a perceived risk, especially given that Faulkner

testified that he was "familiar with . . . Title VII" law, and had sought out advice from legal counsel

upon learning that Plaintiff filed an EEOC complaint. (Trial Tr. 300:1-15).  *See Kolstad*, 527 U.S.

at 535-36 (the standard requires proof that the employer retaliated "in the face of a perceived risk that

its actions will violate federal law").  Accordingly, the jury's finding did not go against the clear

weight of the evidence given the conflicting testimony of VSA's key witnesses, and the failure of

Faulkner to take investigative steps before concurring with the decision to remove Plaintiff from the

sales manager position.

> 3.     *Back Pay Damages*

VSA argues that a new trial should be granted because the back pay award was excessive and

unsupported by the evidence.  However, as a precursor to its arguments, VSA maintains that it was

error for the jury to award back pay because it is an equitable remedy that should be decided by the

Court.  Upon review of the briefs and the record, the Court finds it necessary to address this

preliminary matter.

It is well established that back pay is awarded to successful Title VII plaintiffs. *See Albemarle

Paper Co. v. Moody*, 422 U.S. 404, 422 (1975).  In *Albermarle Paper Co. v. Moody*, the Supreme

Court established a strong presumption in favor of back pay awards to victims of employment

discrimination under Title VII.  *Id*. at 421.  The Supreme Court has explained that back pay under

Title VII is awarded "to make persons whole for injuries suffered on account of unlawful

employment discrimination." *Id*. at 418.  Circuits disagree about the characterization of back pay,

while some circuits have held that a claim for back is equitable in nature and should not give rise to

13

a jury question, others have rejected this notion and held that a claim for back pay is a question properly placed before the jury. *See Troy v. City of Hampton*, 756 F.2d 1000, 1002 (4th Cir. 1985) (claim for back pay is an equitable remedy); *Whiting v. Jackson State Univ.*, 616 F.2d 116, 122-23 & n.3 (5th Cir. 1980) (claim for back pay under Title VII is equitable rather than legal in nature); *Moore v. Sun Oil Co.*, 636 F.2d 154, 156 (6th Cir. 1980) (back pay is equitable relief). *But See Sester v. Novack Investment Co.*, 638 F.2d 1137, 1142 (8th Cir. 1981) (remedy of back pay in cases brought under Section 1981 is more appropriately characterized as compensatory, legal damage, and therefore there is a right to jury trial including claim for back pay).

In *Corti v. Storage Tech. Corp.*, 304 F.3d 336, 344 (4th Cir. 2002), the concurring opinion provides that, "under the scheme established under Title VII the court awards back pay, and the jury awards other compensatory damages." However, in *Gallina v. Mintz*, 123 F.Appx. 558 (4th Cir. 2005) (unpublished),[3] the Fourth Circuit  affirmed a case in which the jury awarded back pay. Nevertheless, in an abundance of caution, the Court will **VACATE** the jury's back pay award and calculate the back pay award anew.

a.      *Time Period in which to Calculate*

VSA argues that, for calculation purposes, the back pay period for Plaintiff commenced on July 17, 2003, the date she was removed from the sales manager position, and terminated on November 2005, the month that Plaintiff was terminated for cause from her employment with Gold

---

[3] Although this case is unpublished, Plaintiff cites to it to support is proposition that back pay was properly awarded by the jury because counsel believed it related to a central issue in the case.  For this reason the Court cites to it in the instant Memorandum Opinion and Order.  *See* Fourth Circuit Rule 36(c),

Key Resorts.  VSA asserts that it would be error to base the calculation on a termination date that ended January 24, 2006, the date the jury rendered the verdict.

The back pay period of recovery commences from the time the discriminatory act causes economic injury, and terminates on the date of judgment.[4]  *See Wells v. North Carolina Bd. Of Alcoholic Control*, 714 F.2d 340, 342 (4th Cir. 1983).  However, the termination period can end before the date of judgment where a plaintiff is terminated for cause from subsequent comparable employment.  *Brady v. Thurston Motor Lines, Inc.*, 753 F.2d 1269, 1277-79 (a prevailing Title VI plaintiff forgoes his period of back pay entitlement when he obtains similar or comparable employment following his discharge, and his terminated for cause).

In this case, Plaintiff was terminated from Gold Key Resorts for cause in November 2005.  However, the position was dissimilar.  Plaintiff's position at Gold-Key Resorts was only on a part-time basis, rather than full-time as she previously held at VSA.  Further, at VSA Plaintiff was a front line sales manager, however, at Gold Key Resorts, Plaintiff was an in-house sales person.  This was the same position that Plaintiff turned down at VSA, because it was a demotion and not in anyway similar to the manager position she had previously held.  Accordingly, the Court finds that the Gold Key Resorts  termination did not serve to end the time period by which to calculate Plaintiff's back pay award, because the position at Gold Key Resorts was not comparable to the position at VSA.  Thus, the Court will consider the back pay time period commencing on July 17, 2003, the date VSA removed Plaintiff from the sales manager position, and terminating on January 24, 2006, the date

---

[4]  Section 706(g) of Title VII provides that "[b]ack pay liability shall not accrue from a date more than two years prior to the filing of a charge with the Commission."  42 U.S.C. § 2000e-5(g)(1) (2006).

15

the verdict was rendered.  Taking this time frame into account the Court must now use trial evidence to determine if an award of back pay is appropriate.

     *b.*     *Mitigation*

     A plaintiff has the duty to mitigate damages.  *Ford Motor Co. V. EEOC*, 458 U.S. 219, 232 (1982) (finding that the duty to mitigate damages requires that the plaintiff be reasonably diligent in seeking and accepting new employment substantially equivalent to that from which he was discharged).  The defendant carries the burden of pleading and establishing that a plaintiff "did not exert reasonably efforts to mitigate . . . damages."  *Martin v. Cavalier Hotel Corp*, 48 F.3d 1343, 1358 (4th Cir. 1995).

     The Court finds that Plaintiff presented sufficient evidence to support a reasonable effort to mitigate damages.  Plaintiff testified that she continued to look for employment from July 2003 until April 2004.  Given the characteristics and nature of the timeshare industry,[5]  Plaintiff testified about the difficulty in finding similar work during that time frame.  (Trial Tr. 188-190).  *See Ford Motor Co.*, 458 U.S. at 231 (to fulfill the duty to mitigate damages, it is clear the one "need not go into another line of work, accept a demotion, or take a demeaning position.").  After being unable to obtain employment in the time share industry, in April 2004, Plaintiff looked for employment outside the timeshare industry.  Plaintiff accepted employment working for Broad Street Mortgage as a loan officer and was employed there for one year. (Trial Tr. 190:23-24).  In May 2005, an opportunity arose at Gold Key Resorts to work in a time share sales position on a part-time basis.  (Trial Tr.

---

     [5]Plaintiff testified that there were only two time share businesses in the Tidewater area, VSA and Gold Key Resorts.  (Trial Tr. 188).  Plaintiff further testified that after being removed from her sales position at VSA, she sought work at Gold Key Resorts, however, due to the seasonal hiring trends at Gold Key Resorts she was unable to obtain employment.  (Trial Tr. 188)

191:2-25).  Based on this evidence, the Court finds that VSA has failed to carry its burden in establishing that Plaintiff did not make reasonable efforts to mitigate her damages after VSA removed her from the position of sales manager.  Accordingly, back pay is appropriate in this case, and the Court must calculate the amount of back pay based on the evidence presented at trial.

      *c.*     *Calculation*

In this case, Plaintiff presented testimony which the Court finds supports an award of back pay.  Plaintiff gave testimony about the average amount of wages she earned during the time she was employed at VSA.  (Trial Tr. 186,195).  Plaintiff proffered W-2 forms to substantiate the figures. In 2000 and 2001, Plaintiff earned $ 103,946 and $112,968, respectively.  This averages out to $108,457 over the two year time period.  Plaintiff testified that she calculated her average wage earnings while in the sales manager's position from 2001-2003, which came to $105,000 a year. (Trial 186:6-21,508:3-14).  Accordingly, beginning from the date she was terminated on July 13, 2003 and ending January 24, 2006 the calculation would be as follows: (1) from July 2003 to December 2003 Plaintiff would have earned approximately $43,750, (2) from January 2004 to December 2004 Plaintiff would have earned approximately 105,000, (3) from January 2005 to December 2005 Plaintiff would have earned approximately $105,000, and (4) from January 1, 2006 to January 24, 2006 Plaintiff would have earned approximately $8,750.  As such, Plaintiff would have total approximate earnings of $262,500 less any wages she earned after her termination. Plaintiff testified about the wages she earned after being terminated from VSA, and acknowledged that she was not asking for back pay during the periods that she earned those wages.  (Trail Tr. 190:25-191:22).  Plaintiff testified she earned wages of $18,000 working at Broad Street Mortgage and $47,000 working at Gold Key Resorts.  (Trial Tr. 191:1, 192:18-20).  Thus, subtracting these

17

subsequent earnings, Plaintiff would have earned approximately $197,500 over the back pay time period.

    d.    *Prejudgment Interest*

In *Loeffler v. Frank*, the Supreme Court held that consistent with the "make-whole" scheme of  Section 706(g) of Title VII, "Title VII authorizes prejudgment interest as part of the back pay remedy in suits against private employers." 486 U.S. 549, 557 (1988).  "Prejudgement interest serves to compensate for the loss of use of money due as damages from the time the claim accrues until judgment is entered, thereby achieving full compensation for the injury those damages are intended to redress."  *West Virginia v. United States*, 479 U.S. 305, 310 n.2 (1987).  "Prejudgment interest, like all monetary interest, is simply compensation for the use or forbearance of money owed." *Transmatic, Inc. v. Gulton Industries, Inc.,* 180 F.3d 1343, 1347 (Fed.Cir.1999).  *See Maksymchuk v.* Frank, 987 F.2d 1072, 1077 ("A dollar tomorrow, unless interest is added, does not equal a dollar today.");  City *of Milwaukee v. Cement Division, National Gypsum, Co.,* 515 U.S. 189, 197 (1995) ("[p]rejudgment interest is not awarded as a penalty; it is merely an element of just compensation."). Prejudgment interest lies within the sound discretion of the Court.  *Maksymchuk*, 987 F.2d at 1077.

"An appropriate method to calculate prejudgment interest is to compound the total amount of back pay for the period between Plaintiff's termination from [employer] and the date of the jury's verdict, at an interest rate corresponding to the average inflation rate for that time period."[6] *Ford v. Rigidply Rafters, Inc.*, 984 F. Supp. 386, 391 (D.Md. 1997).

---

[6]  The Court in *Ford* employed the following compound interest formula: $F = P [1 + (i/12)]^m$..  Where F = future value of money (total of principal and interest), P = principal (back pay award), i = interest rate expressed as a decimal, and m = number of months compounded. *Ford*, 984 F. Supp. At 392 (citing Jose A. Sepulveda et al*.,* Theory of Problems of Engineering Economics MICS 12 (1984)).

In this case, the back pay is compounded for the thirty (30) months between Plaintiff's removal from the sales manger and the jury's verdict.  The Court will use a 2.21 % rate of interest, based on the approximate average interest rate during the time period. Using the formula set forth in *Ford*, the  Court will enter an amended judgment order granting Plaintiff $208,708.00.

    4.    *Evidentiary errors that resulted in unfair prejudice*

It is well established that, errors in the admission or rejection of evidence may be grounds for a new trial.  *See Montgomery Ward & Co.,* 311 U.S. at 251.  However, Rule 61 of the Federal Rules of Civil Procedure, provides that no error "is ground for granting a new trial . . . unless refusal to take such action appears to the court inconsistent with substantial justice." FED. R. CIV. P. 61 (2006). *See Ingram Coal Co. V. Mower, L.P.*, 892 F.2d 363, 366 (4th Cir. 1989) ( "a court at every stage of the proceeding must disregard any error or defect in the proceeding which does not affect the substantial rights of the parties.").  Thus, it is only errors that cause substantial harm to the moving party that justify a new trial, and errors that are not prejudicial do not necessitate a new trial.

VSA moves for a new trial on the grounds that the Court erred in making certain evidentiary rulings which VSA asserts resulted in unfair prejudice against them.  Specifically, VSA cites the following errors: (1) admitting evidence regarding the underlying claims of gender and age discrimination; (2) excluding evidence of guest complaints; (3) excluding evidence that Plaintiff received referrals between May 2003 and July 2003; (4) excluding evidence concerning Plaintiff's termination from Gold Key Resorts; (5) allowing the testimony of McLaclan and precluding evidence as to her bias.  The Court will address each allegation of evidentiary error in seriatim.

    a.  *Admitting Evidence Regarding the Underlying Claim*

VSA asserts that the Court admitted substantial evidence regarding the facts and circumstances that led to Plaintiff filing an EEOC complaint in May of 2003.  VSA argues that the

evidence had no probative value and was therefore irrelevant.  In the alternative, VSA argues that even if the evidence was relevant, it should have been excluded because its probative value substantially outweighed its confusion and prejudicial effect.  The Court disagrees.

On review of the record, it is clear that the Court did not allow any evidence, testimonial or otherwise, as to the underlying claims of age and gender discrimination.  In fact, as evidenced by the record, there are points during trial where the Court objected sua sponte to evidence about Plaintiff's claims of age and gender discrimination, and further cautioned counsel to limit and narrow the focus of their questioning to avoid confusing the jury.  (Trial Tr. 147:18-20,148).  With that being said, the Court did allow evidence as to the adverse attitude and conduct that VSA engaged in after Plaintiff went to the EEOC in March 2002 and March 2003.  Both parties acknowledge that Plaintiff officially filed the EEOC claim in May of 2003, however, Plaintiff testified that before that time, Faulkner, Georgitsis and others were aware that she had gone to the EEOC on the other two occasions.  Plaintiff presented testimony of VSA's reactions upon discovering that Plaintiff had gone to the EEOC.  The Court finds such evidence as to VSA's adverse reaction, attitude, and conduct, both relevant and probative in showing VSA's intent and plan when an employee, and specifically Plaintiff, in fact filed an EEOC complaint.  For this reason, the Court finds that such evidence goes to VSA's overall intent and attitude toward employees who went to the EEOC, and therefore to Plaintiff's ability to prove VSA's articulated reason as pretext for retaliating against her filing an EEOC charge in May 2003.  Thus, no error occurred in placing this evidence before the jury.

b.  *Excluding Evidence of Guest Complaints*

VSA asserts that the Court erred in disallowing the admission of evidence pertaining to guest complaints about Plaintiff's attitude and conduct during February 2003 through April 2003. Specifically, VSA argues that the evidence was in the form of a stipulated exhibit, and therefore

should have been admissible.  Further, VSA asserts that because the evidence revealed that her APG declined due to Plaintiff's attitude toward customers, it was central to rebutting her assertion that VSA manipulated her APG.

The Court disagrees.  Notwithstanding the objection opposing counsel made during trial, the jury was alerted to the fact that Plaintiff had received complaints about her conduct with customers in 2003.  (Trial Tr. 366, 17-19).  The specific reports served to reinforce VSA's reason for terminating Plaintiff.  The Court finds that it was unnecessary to go through the specific complaints when VSA's articulated reason was set before the jury by stipulation of both parties.  However, even assuming that disallowing VSA to use the exhibit was error, the Court does not find that it was substantial error.  There were other grounds, besides the APG argument, that the jury could have used in finding that VSA's articulated reason was not the true reason for her removal from the sales manager position.  For example, there was evidence that VSA never told Plaintiff that her APG would be a determining factor in her employment, in fact supervisors never told Plaintiff that her APG was a concern.  (Trial Tr. 173:6-25-174:7-12, 311:3-9).  Further, even with the allegations of age and gender discrimination, VSA did not investigate the reason for Plaintiff's low APG before removing her from the sales manager position, even though she had been a long standing top performer.  (Trial Tr. 314:5-23).  The bottom line is the jury, as the ultimate fact-finder, had the option to believe or disbelieve VSA's articulated reason, and there was evidence presented, excluding the APG argument, that could support the jury's finding.  Accordingly, the Court finds that this evidentiary ruling does not warrant a new trial.

c. *Excluding Evidence of Referrals*

VSA also moves for new trial on the argument that the Court's exclusion of Kathryn Andes' ("Andes") testimony on the subject of referrals was substantial error.  Specifically, VSA asserts that

such testimony would have allowed VSA to rebut Plaintiff's allegation that she received no referrals between May 2003 and July 2003.

Based on a review of the record, the Court finds that its ruling was not in error. Counsel for VSA attempted to have a witness testify to records that Plaintiff's counsel had never seen or heard about. Even counsel for VSA stated that the records were produced the night before the witness took the stand. (Trial Tr. 346:10-25, 347:2-21). In fact, on further review of the records, it was revealed to the Court that the records were ones which Plaintiff's Counsel had requested during discovery. (Trial Tr. 347:24-348:1-14). Allowing the witness to testify on records that Plaintiff's counsel had not seen, and further had requested during the discovery process, would have been a clear discovery violation. Accordingly, excluding testimony about the records was not error.

### d. *Excluding Evidence Concerning Plaintiff's Termination from Gold Key Resorts*

VSA asserts that the Court erred in disallowing rebuttal testimony that would have impeached Plaintiff. VSA argues that Plaintiff testified that she was discharged from Gold Key Resorts for violating a company rule that she did know existed. Through the testimony of Sondra Ward, VSA sought to rebut Plaintiff's testimony by showing that Plaintiff had direct knowledge of the company rule and, therefore, was untruthful in her testimony. The Court's exclusion of the testimony was not in error.

As the record indicates, VSA did not list Sondra Ward as witness on its final pretrial list. (Trial Tr. 483:11-17). The district court has the discretion to refuse allowing rebuttal testimony of one who is not listed in a pretrial order, where the need for the rebuttal testimony could have been reasonably anticipated. *See Semper v. Santos*, 845 F.2d 1233, 1238 (3d. Cir. 1988) (the trial court's exclusion of testimony because of the failure of counsel to adhere to a pretrial order will not be disturbed on appeal absent a clear abuse of discretion). That being the case, VSA "from the outset

Case 2:04-cv-00635-RAJ-JEB   Document 132   Filed 04/25/06   Page 23 of 24 PageID# 36

of this action knew the [defendant's] contentions and the necessity for rebuttal testimony could reasonably have been anticipated." *American Int'l Trading Corp. V. Petroleos*, 835 F.2d 536, 538 (5th Cir. 1987)  (internal alteration omitted) (alteration added) (citation omitted).  Therefore, the Court properly acted within its discretion in refusing to allow the rebuttal witness to testify.  Most importantly, VSA attempted to impeach Plaintiff on a collateral issue. *See United States v. Kozinksi*, 16 F.3d 795, 805-07 (7th Cir. 1994) ("the question of what is a collateral matter is squarely within the discretion of the trial court").  Impeachment on a collateral issue is improper, and therefore the Court properly excluded Ward's testimony.

    *e. Allowing the Testimony of Cynthia McLachlin and Precluding Evidence as to Bias*

    VSA argues that the Court should not have permitted the testimony of McLachlin because her testimony pertained to comments that occurred fourteen months before Plaintiff filed her EEOC charge.  As such, VSA assert that McLachlin's testimony was irrelevant, and, even assuming any relevancy, its prejudice outweighed any probative value.  Further, VSA asserts that the Court did not allow it to introduce evidence that McLachlin threatened VSA employees.  As a result, VSA argues that it was unable to demonstrate that McLachlin held a bias against VSA, and thus impeach her credibility.

    The Court finds this argument without merit.  McLachlin's testimony was probative in establishing that VSA had an intent to discriminate against Plaintiff if she filed an EEOC complaint.  The prejudicial effect of this testimony does not outweigh its probative value given that the evidence went to an ultimate question before the jury, that being whether VSA retaliated against Plaintiff when she finally filed an EEOC complaint.  Further, the Court finds that there was no error in excluding evidence about alleged threats made by McLachlin.  VSA was able to demonstrate McLachlin's possible bias in other forms.  VSA put on evidence that McLachlin was

terminated for misconduct, and even questioned her as to whether she had an "ax to grind to grind with VSA." (Trial Tr. 86:4-92:12). The Court finds that such evidence was enough for the jury to infer the potential bias that McLachlin had toward VSA. Accordingly, the Court finds no error in its ruling.

## IV. CONCLUSION

For the foregoing reasons, the Court **VACATES** the jury's back pay award, and the Court awards back pay of $208,708. Additionally, the Court **DENIES** VSA's Motion for Judgment as a Matter of Law and **DENIES** VSA's Motion for a New Trial.

The Court **DIRECTS** the Clerk to send a copy of this Order to counsel for the parties.

**IT IS SO ORDERED.**


_____/s/_____
Raymond A. Jackson
UNITED STATES DISTRICT JUDGE

Norfolk, Virginia
April  25,2006